Good morning. Proceed when you're ready, Counsel. Thank you. May it please the Court, I'm Steve Hirsch, Pro Bono Counsel for Petitioner and Appellant Mansuru Tijani, and I'm pleased to have with me at Council table today Judy Rabinovitz of the ACLU Immigrants' Rights Project. With the Court's permission, I'd like to reserve five minutes of my time for rebuttal. Thank you. This appeals about whether Mansuru Tijani should get a bond hearing, not about whether he should be released from vice detention, just an individualized bond hearing, which we say due process requires. I can't emphasize enough that the very limited relief sought here should inform every step of the Court's analysis. Maybe, I know there's been a development since you originally filed the briefs and we were notified, so maybe you want to start with why this isn't moot at this point. Yes, Your Honor. I'd like to make three responses to the government's mootness argument, which appears to rely on the assertion that this case is no longer governed by 1226C, but rather by 1231A. Our first response to that is that for purposes of the constitutional and constitutionally guided arguments that we're making today, that just doesn't matter. We don't think that either statute authorizes the 20-month detention without bond of a lawful permanent resident who has substantial arguments against removal. So what, are you asking us to decide the constitutionality of this other statute now? We believe that under either case, you know, we have – How many more statutes can you think of that are governed by the same standard? I mean, should we decide them all? Well, Your Honor, we have both statutory and constitutional arguments. While it might be slightly more difficult to adjudicate our constitutional doubt argument in the present circumstance, we still have an argument that detaining someone for 20 months without a bond hearing is simply unconstitutional, no matter what statute you're under. Now, a second response I have – Well, it's going to make a difference what statute you're under. Don't take it whatever. He's now been ordered deported by the board. We certainly – and you know we are warned not to decide constitutional issues unless we have to. So all you've got is a statute. Now, what's the statute that he's now held under? That's the only statute before us. Then maybe it's moot. Well, Your Honor, let me also say that let's – I understand, Your Honor. I do have a couple of further responses on this point, though. First of all, I think that this is clearly a case in which even if he is presently under 1231A, as the government seems to be intimating – I'm not sure whether they've committed to that standpoint – but the case is capable of repetition, yet evading review. If, for instance, the Court found – Well, he won't be in that position. Oh, yes, he could be, Your Honor. If his order of removal were reversed, and in particular – and I mean not in this proceeding but in the next one – if that were reversed and it were found that he did not commit an aggravated felony warranting removal, he could be back before an immigration judge to seek – Big speculation that he'll make it through some appeal from the board. Yeah, what is the standard there? I mean, is it that it has to be likely at some level that he would be subject to that again? I mean, what is the standard? Any remote possibility is good enough? Well, Your Honor, I don't know how remote it is, but – If that happened again, then he would have a hearing again, a Joseph hearing or whatever at that point. Yes, he would. And then before he would have, in light of Kim, he wouldn't have a due process claim until after he was allegedly held for an unreasonable period of time, right? So in order to – you know, we don't know that that's going to – you know, we're assuming that that's going to happen. I mean, that's – I'm not certain whether you can segment the time out of his life that way. There's a case called Oyadeji, which makes the point that the clock never stops ticking on your life. And I don't know whether it matters – I don't know whether you can just set the clock back to zero after a person's been held that long. But it's like a speedy trial act, you know, in the criminal law. You can start that running over again. And I think that's what Judge Callahan is suggesting here, right? In other words, if he's recharged or remanded and he again comes under the statute, then the clock starts running again. And you get a – you know, and certainly the initial period, we'll call it, under the – Kim is not unconstitutional, is it? A brief period of time in order to determine his removability? Well, again – You have to wait at least until a brief period of time, whatever that means, has expired, don't you? Again, Your Honor, since we're only talking about whether he gets a bond hearing, I think it's legitimate to consider the entire length of time that he's – But let me move on to one related point I want to make, which could be dispositive on this mootness issue, which is that Mr. Tajani plans to file a petition for review. He may have already done so, in fact, but it's going to be imminent. A petition for review and a stay of his removal order from the BIA. And under 1231A1B2, that means that the whole 1231A scheme doesn't apply. So if you examine the statute, you'll see that even if it matters which statute we're going under, which we can test, and even if going under 1231A for now would moot the case under some theory, the fact is this case isn't going to be under 1231A because, pursuant to the provision I've just cited you, it's just not as a matter of the – on the face of the statute. Let me just speculate for a minute now. Suppose he does file a petition for review, all right, and then he files a stay, you know, at the same time. He asks for a stay. Couldn't he at that point ask for some kind of, you know, bail again under the new statute? And then in that proceeding argue that, well, you know, I've been held all this time and I should be released. Isn't that the place to make that argument? Well, Your Honor, I think the question is has anything changed? And if you apply 1231A1B2, then this is going to still be a 1226C case, and this appeal is just as it was when we filed it. So, Your Honors, if I can move to the merits, I'm happy to entertain any further mootness questions, but if I may, this appeal does arise because the government has taken the untenable position that 8 U.S.C. 1226C permits it to hold a lawful permanent resident in pre-removal detention without a bond hearing for as long as it may take to complete his removal proceedings, be it weeks, months, or years, and regardless of whether or not the alien has conceded deportability. Under that interpretation, if the BIA loses a detainee's file, it's okay to hold him in pre-removal detention indefinitely without ever giving him a bond hearing. Under that interpretation, even if an immigration judge rules that the detainee is not removable, the government could in theory take the position that he can be detained anyway without a bond hearing because the BIA will ultimately reverse. So this case raises two issues expressly left open by the Supreme Court's decision in DeMoor v. Kim. Crucially, the DeMoor case involved a detainee who had conceded that he was removable and thus had waived his right to a Joseph hearing. The court therefore stated that it had no occasion to decide whether Joseph hearings adequately protect the rights of 1226C detainees. And although the DeMoor court upheld the constitutionality of 1226C as applied to an alien who concedes deportability, it did so based on the government's representations that such detention normally lasts only for the very brief period necessary to conclude removal proceedings. The Kim case, though, cites Joseph, correct? Yes, it does. All right. And, you know, can't we infer from that if it were so unconstitutional as you have indicated they would have dealt with that at that point? I mean, they don't, you know, they don't cite problems in it. Not at all, Your Honor. I disagree with that. Oh, I'm sorry. Well, I'm just saying, I mean, if they hadn't mentioned Joseph, that might be a little bit different. But they mentioned Joseph in there, so they're aware of Joseph, and they don't see the problems that you see. Your Honor, they mentioned it only to say that they were not going to consider its adequacy on this occasion. That's why they mentioned it. That's explicit in the decision. Now, D'Amour doesn't hold that 1226C is constitutional if read the way that the government now urges. And, indeed, a close reading of the various opinions in D'Amour suggests the opposite conclusion, as an identifiable majority of the D'Amour court, including Justice Kennedy, who provided a fifth vote for the majority, would hold that an alien has a right to an individualized bond hearing if 1226C detention goes on for an unreasonable length of time. In this case, Tijani does not concede removability, indeed has substantial arguments against removal, and has been held without a bond hearing for 20 months, a period that the government doesn't even try to justify in terms of having any reasonable relation to removing him. Perhaps the most inexplicable aspect of his case is that he was denied a bond hearing for an additional 13 months while his appeal from the IJ's removal order languished in the BIA. Then, just 11 days before this argument, the BIA finally moved itself to issue a two-sentence affirmance, which set the stage for the mootness discussion that we've been having. And it appears from letters recently submitted by the government that these 11th-hour rulings have occurred repeatedly. Thus, it's difficult for me to avoid an inference that there is a practice here of trying to avoid judicial review in cases that might set constitutional limitations on 1226C detention. This is one of those cases, because applying 1226C to Mr. — Well, I don't think I agree with that inference, but suppose that were a reasonable inference. I mean, what's the consequence of that? The consequence is that the mootness issue ought to be seen for what it is, and this should be looked at in the context of capable of repetition yet evading review, because this is — So it helps you with the evading review if one agrees with that inference, and I say I don't, at least not yet. But it helps you with that prong, but it doesn't help you on the second prong, does it? I'm sorry, Your Honor. Well, which is that the petitioner is likely to be exposed to this practice again. But as I said, he is. All right. Yes, we've been over that. Right. Your Honor, we think that this — that if the statute's read, as the government seeks to read it here, that two grounds of constitutional doubt arise. First, the substance of due process requires that an alien's detention bear a reasonable relationship to the statutory purpose for which he is detained. This is taught explicitly by the Supreme Court's decision in Zadvitas v. Davis and by the Sixth Circuit's decision in Lee v. Hansen, and it also emerges implicitly from the Supreme Court's decision in DeMoor v. Kim. Thus, the court held in Zadvitas that the government can't hold an alien indefinitely in post-removal detention, but rather after six months must demonstrate a significant likelihood of removal in the reasonably foreseeable future. I see Zadvitas as distinctive in — capable of distinguishing in that this could be too long, but indefinite. I mean, Zadvitas uses the words indefinite because there was no place to send these people. There didn't look like that there could ever be a place to send them. That's not the case here. It's just a question of is there a point where the government has to show that the time period that they're taking is reasonable or the person's entitled to bond. We know they can hold them, but then is there a point where it gets too long? And we also have the tension with immigrations in the area that, you know, Congress gives pretty definite, you know, distinction into the agency as far as that goes. So we've got that tension that the courts aren't going to — I don't think you're ever going to see the courts saying, well, it has to be 45 days, it has to be 90 days, it has to be such and such. I don't think that you will see that occurring. But is there a point where it just gets too long and the government has to justify somewhat how — why it's taking so long, and that would be pretty — that would be, I would have to say, fact-intensive. But Zadvitas, this — I don't see this as indefinite. It could be too long, but not indefinite. Well, in the first place, Your Honor, I'm not sure that the distinction between indefinite and unreasonably long is such a hard and fast one. I mean, someday, with improving relations with Vietnam, you can get a repatriation treaty with Vietnam. Likewise, someday, if the B.I. loses the petitioner's file, he may nevertheless be put back on track. But there's an element of speculation in both situations, even though one is about indefiniteness and one is supposedly about unreasonableness. But beyond that, it seems to me that we have offered two approaches, one of which uses the Zadvitas, you know, actual bright-line rule approach that you've commented on. But we've also offered another alternative, which is the one taken by the Sixth Circuit in Lee v. Hansen, where a mushier standards-based approach was used that is more fact-specific, as Your Honor suggested. In that case, it was held that an alien who's in 1226 detention can bring a habeas petition in which he alleges that he's been held beyond the time reasonably necessary to complete removal proceedings in timely fashion. You're at your five minutes if you want to reserve. I think we're familiar with the Lee case, the Lee or the Lye case, however you say it. Thank you, Your Honor. All right. Good morning. May it please the Court. My name is Ernest Cordero, and I represent FLEs in this matter. Initially, I would like to address the mootness issue, since that is obviously of interest to the Court and is the subject of much discussion. It is the government's position that the 1226c argument of the appellant is moot, that upon the administrative final removal order, the detention switch to 8 U.S.C. Section 1231A. As mentioned in a letter submitted to the Court, the government has actually briefed that issue in another appeal that's pending before the Ninth Circuit in the Victor Martinez v. Carly Thompson case. I think the government's position is set forth there. In terms of getting to the merits of the case, putting aside the mootness issue, let me ask you one question on the mootness argument. What about Mr. Hirsch's argument that the argument is the same, you know, under other statutes under which he might be detained, you know, now, now that he's been found to be removable, held to be removable by the BIA? Well, it's a different statute with the same standard. It's a different purpose. This is one of the problems in this case, and I wanted to get into that when I discussed the merits, but it's perhaps appropriate at this point, which is the case seems to evolve, and it's our position that we need to look at the correctness of the district court's opinion based on the case presented to the district court. If there have been events that have occurred subsequent to that point in time, then perhaps the court might consider a remand for further proceedings. Mr. Tijani perhaps may take some other action. But the court, this case would be. Well, now that he's under a different statute, does Kim apply? No. This would now be a post-final removal order case, and that would apply. All right. I think what counsel then indicated, that he could be back in the situation where he's then pre-removal again, and that's how it would be capable of repetition, assuming he prevails. There are a whole number of possibilities, and we're getting to the point where it becomes very speculative exactly what would occur, and it becomes very difficult to formulate legal positions. We do have to make some kind of judgment on the likelihood of repetition, right, in order to judge whether or not that exception to mootness applies. Well, their position, first of all, it's not entirely clear whether or not Mr. Tijani has filed an appeal. From what I heard. Well, but the time to file an appeal hasn't expired. Right? He still has time to file it. He still has time to file it. That's correct. But as we stand here today, we still don't know whether he will. There's been a representation that apparently he intends to do so, but people change their minds. So we don't know today for sure, since it hasn't been done, whether or not it will, in fact, happen. Secondly, if it does happen, in getting to the issue of the possibility of repetition, he would appeal his removal based on the threshold convictions, which are actually already before this court, because they go to whether or not he was subject to mandatory detention. So presumably if the court felt that it had to address that issue, there is a record before the court that would be adequate to make that assessment. So what has to happen for him to get back into pre-removal status and have Kim apply? Presumably he would have to prevail on his other appeal. And then he goes back, and then if it goes on again, then he would have another Joseph hearing, and then he would have to establish some sort of unreasonableness in the time period before he would be back here, correct? That would be my understanding. And it also assumes that he takes certain steps. Well, the other thing that could happen is just and you're right, we're just speculating now. I mean, he could file a petition for review. This court could find that, you know, the criminal conviction convictions are not qualifying. Right. And so reverse. And then there'll be no further proceeding. Right. In other words, he wouldn't be subject to the same same detention again. He would not be. I mean, that's a I don't know how likely or remote it is, but it's a possibility. Right. One of the possibilities. That's correct. That issue is before the court. Getting back to some of the other issues that were briefed in the case, there have been a lot of challenges made to the general legal framework that governs these types of proceedings. And I think it's very important in this case to look specifically at the facts before the district court judge. At the time the district court ruled on this matter, Mr. Tijani already had an appeal before the BIA pending. So in terms of the time that was the time issue before the district court, it did look as if Mr. Tijani's issues would be resolved in the foreseeable future. There had been two months of appeal before the BIA. That is a very different situation than where we find ourselves today. And there's no way for the district court to know at that time what would happen subsequent to it. At the time, Mr. Tijani had been in custody for nine months, which is a couple of months more than the Petitioner and the Kim case, so it's not drastically more. And so from a timing standpoint, when this Court reviews the correctness of the district court's decision, it's our position that it should be based on what the district court actually confronted at the time. In terms of the actual merits of the threshold criminal issues, the issues of the moral turpitude and the issue of whether or not Mr. Tijani had committed an aggravated felony involving a loss of more than $10,000, here again, the facts of the case are very important. They have made an attack on the Joseph standard. But, in fact, by the time the district court ruled, the I.J. had already made his determination on the issues, a final determination on the issues. It was not Mr. Tijani was being detained at that point pursuant to that determination, not some preliminary Joseph standard determination. So that was actually moved by the time the district court ruled on it. So you're saying if by virtue of what happened in the I.J., he couldn't have, he wouldn't have been able to prevail at any standard under the Joseph hearing? Right. The Joseph standard, which governs the I.J.'s initial determination of whether or not the I.J. believes that the, that the defendant had committed the alien is subject to mandatory detention, is different than the final decision made by the I.J. Once the I.J. makes the final decision, it is final. It is not the preliminary type of Joseph decision that's made. So my point is, by the time the district court ruled, the I.J. had made his final decision on remover, removal. There had been a merits determination, and he had ordered Mr. Tijani removed by then. So there was, there was no argument about the Joseph standard that really could be presented to the district court, because it had been superseded by the final merits determination by the I.J. In terms of the actual crimes themselves, moral turpitude, we've briefed the issue. Mr. Tijani was convicted of violating California Penal Code Section 532A. This, this statute, which appears to have all the elements of fraud, it requires a false representation that's made knowingly, that's made with the intent that it should be relied on in order to procure property, cash. In this case, it was done in connection with a credit card fraud. And we think that under law, by law, that type of statute just on its face isn't But isn't there like a minimum monetary requirement? The minimum monetary requirement only applies to the aggravated felony provision, where there are two different bases under which he could be detained. One is to have committed two crimes involving moral turpitude that would not require the monetary amount. The second would be an aggravated felony involving a loss to the victim in excess of $10,000. And it's our position that he would qualify under both. Under either. Under either. Correct. And what does the record, what does the record show about the $10,000? There is an abstract of judgment in the record that sets forth the restitution to be paid by Mr. Tijani. And the restitutionary amount is specified is in excess of $10,000. Now, is that sufficient, the abstract of judgment? We cited authorities that say the abstract of judgment can be relied upon. We also asked the court to take judicial notice of the unpublished opinion that arose from Mr. Tijani's criminal case. But that opinion, you know, in the opinion, it's only sort of like a passing comment. I don't know if we consider that a finding of fact. Well, Mr. Tijani did raise the issue of the sufficiency of the evidence relating to his conviction. And I can understand the court's concern about whether it is sufficient. But we believe that the abstract of judgment does set forth the restitution. But you said you cited authority that an abstract of judgment is sufficient? That it can be considered. Okay. Well, it's probably not the best record. I think that we could all probably agree on that. There's probably no doubt if it went back that in everything that's there, it would be $28,000. But it's probably not the best record. That's true. But, in fact, since it can be either statute, we think that the fact that he has committed two crimes involving moral turpitude is enough. And that is, in fact, what the district court's opinion turned on and appears to be the argument that has garnered the most support down below. At this time, unless the court has any other questions. There do not appear to be any other questions. Thank you, counsel. Thank you. Let me just start by saying that we would be happy to submit supplemental briefing on the mootness issue that seems to have captured the court's attention this morning. Let me also just quote from a leading Ninth Circuit case, Jacobus v. Alaska, on the mootness issue and what the standard is because there's been a lot of talk about how speculative it is that he could be back in the same situation. And Jacobus says that dismissal of a case on grounds of mootness would be justified only if it were absolutely clear that the litigant no longer had any need of the judicial protection that it sought. I think it's quite clear that he will. Indeed, I think it's clear that we could find ourselves in a few years right back at the same position on his new review petition facing yet another 11th. If he won and this case eventually came back, there could be yet another 11th hour BIA decision and yet another mootness argument. In any event, how speculative really is it? Let's think about this Leocal case that came down from the Supreme Court last year in which the detainee argued that Florida's DUI statute was not a crime of moral turpitude. He lost it every single step of the way. He lost it before the IJ. He lost before the BIA. He lost on all of his appeals. And then after three years, a unanimous Supreme Court issued a decision authored by Chief Justice Rehnquist, completely vindicating his position. Secondly, I thought it was interesting that the government urges you to see events as they were before the district court because if you really took the government up on that, I don't think we'd have a mootness issue here. We wouldn't have a BIA ruling that's occurred. So that argument strikes me as a little bit contrary. Could I ask you an essentially practical question? As I look at this man's criminal record, if he did get an individualized bond hearing, a judge would very likely deny him. So you would have heaved and strove mightily, but in the end, he would end up exactly where he is. So shouldn't we take that practical likelihood into account, or should we? I don't think so, Your Honor. Maybe you're right. Maybe not. But that is something that does seem to lie at least somewhat in the realm of speculation. And, of course, this course — Give some idea of what people give bail for and don't give bail for. This record's not very attractive. Perhaps not, Your Honor. But we're talking about, when you come right down to it, whether the government in this and other cases has the right to hold somebody for many, many, many months, far beyond the normal detention period under 1226C without a bond hearing. That's a rather extreme result, I would submit. Well, it is. But as a point here, it's somewhat abstract, right? The other way to flip it, Judge Noonan, is to say, well, in that case, certainly this is not a case in which recognizing the right that we discuss here is going to cause anybody much harm. No. It's true. Your Honor, Your Honor, with respect to the merits arguments that we got into briefly here, I'd just like to reiterate that the Joseph standard that we are advocating is, as Justice Breyer suggested in his DeMoor v. Kim concurrence, akin to the one under the Bail Reform Act, and that standard was articulated by this Court in U.S. v. Handy as being whether the detainee has posed issues debatable among jurists of reason. And I don't think there's any question that on both aggravated felony and on moral turpitude, this petitioner has at least met that standard, and I think it's incorrect to suggest that he is not prejudiced by the use of the wrong and unconstitutional Joseph standard. Thank you. Thanks once again to both counsel, and thank you for your pro bono representation. Thank you. If we choose, the matter will stand submitted at this time. After the panel conferences, if we feel any additional need for briefing on the mootness issue, we'll contact you. All right? Thank you, Your Honor. Thank you. All right, the Court at this time is just going to take a we have one matter remaining on calendar, which would be Sierra Club v. Federal Highway Administration. The Court has granted requests for cameras at this point. We're going to take a very brief recess just to allow the final setup of the cameras. So I would say for those of you that are here observing, don't go very far, because we should be back quite briefly. They'll notify us as soon as they have the final setup. Thank you. All rise. This Court stands in recess for five minutes. Thank you. Kyle, is there a way to get this loose? Yeah, it's tape. Is there any way to cut through it or rip it apart? That's my guess. Level check, one, two, three. Mic check, one. Mic check, two. Level check, one, two. Secondary check, one, two. Check, check, one, two. Check, one, two. Yeah, I'd like to. How's that? Does the second mic sound okay? The wireless lav? Okay. Check, two. Check, one. Check, check, one, two. Check, check, one, two. Check, check, one, two. Check, check, one, two. All rise. This Court now resumes its session. Good morning again. We're back.
judges: Noonan, Tashima, Callahan